IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JESSIE MAE TRAPPIER, ) | Civil Action No. 3:11-2494-RMG-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

## **ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for DIB and SSI on December 3, 2007, alleging disability as of November 27, 2007. Plaintiff's applications were denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). A hearing was held on February 3, 2010, at which Plaintiff appeared and testified. On March 23, 2010, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled. The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff could perform.

Plaintiff was forty-six years old at the time of the ALJ's decision. She has a high school education with past relevant work as a laundry worker, a housekeeper, and a shipping and receiving clerk. See Tr. 18, 31-33, 143. She alleges disability due to osteoarthritis of the left knee; impingement syndrome of the right shoulder; and coronary artery disease, status post stenting and myocardial infarction. See Tr. 12, 33-34, 142.

The ALJ found (Tr. 12-19):

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since November 27, 2007, the alleged onset date (20 CFR 404.1571, *et seq.,* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: osteoarthritis of the left knee; impingement syndrome of the right shoulder; and coronary artery disease, status post stenting and myocardial infarction (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the criteria of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to do the following: to sit for 6 hours in an 8 hour day with normal breaks; to stand and walk for 2 hours total in an 8 hour day for 15-30 minutes at a time; to lift 10 pounds occasionally and less than 10 pounds frequently; to push and pull within 10 pound limitation; occasionally to perform postural activities but cannot climb ropes, ladders, or scaffolds or crawl; occasionally to reach with the right upper extremity to table level and with the left upper extremity to chest level, but can handle, finger, and feel without limitations; and to avoid exposure to extremes of heat, cold, humidity, dust, fumes, gases, and chemicals.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 3, 1964, and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

On July 22, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. Plaintiff filed this action in the United States District Court on September 16, 2011.

**STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

3

## MEDICAL EVIDENCE

On November 29, 2007, Plaintiff was admitted to Georgetown Memorial Hospital with complaints of chest pain. An EKG was administered which showed evidence of myocardial infraction. Tr. 200. She underwent cardiac catheterization and stenting. Tr. 200-231. On December 2, 2007 Plaintiff was discharged, and it was noted that her diagnoses included myocardial infarction, coronary artery disease, hypertension, hyperlipidemia, anemia and thrombocytosis. Tr. 200-231.

On December 12, 2007, Plaintiff had a follow-up appointment with cardiologist Dr. Mitchell L. Devlin. Plaintiff reported that she was doing well with no chest pain, shortness of breath, or problems at the groin site. Plaintiff complained of difficulty walking and was using a cane, but Dr. Devlin noted that Plaintiff switched it from side to side and did not appear to be using it consistently. Examination revealed that Plaintiff had a regular heart rate and rhythm with no gallops, rubs, or abnormal heart sounds; she had no obvious spinal abnormalities; she had normal gait and station with normal muscle strength and tone; and she was fully oriented with an appropriate mood and affect. Dr. Devlin stated that he assured Plaintiff that she had no limitations from a cardiac standpoint and could return to work as soon as she felt able, and stressed the need for "complete smoking cessation." Tr. 234-235.

Plaintiff consulted with Dr. Eric Heimberger (an orthopedist), on January 10, 2008, for evaluation of right shoulder pain, mainly with overhead activity and when sleeping on her shoulder. Plaintiff denied numbness or tingling. On examination, Dr. Heimberger noted that Plaintiff's right shoulder had pain with the extremes of abduction and forward flexion and positive impingement sign, but there was no tenderness over the clavical or AC joint, bruising, or instability, and near full range of motion. He further noted that there were no abnormalities with respect to Plaintiff's left

upper extremity. Right shoulder x-rays showed no acute findings. Dr. Heimberger assessed right shoulder impingement syndrome with subacromial bursitis of Plaintiff's right shoulder. Dr. Heimberger recommended a conservative course of treatment and provided Plaintiff with a cortisone injection. Tr. 254-255.

On February 6, 2008, Plaintiff complained to Dr. Devlin of "some chest pain on occasion" lasting two to three minutes at a time, and related to exertion. Plaintiff also complained of continued right lower extremity discomfort but denied shortness of breath. Dr. Devlin noted Plaintiff had normal gait and station, no abnormalities of her spine, normal muscle strength and tone, and normal extremities. There was no evidence of edema or varicosity of Plaintiff's extremities. Dr. Devlin ordered additional testing to evaluate Plaintiff's complaints of leg and chest pain, and again reenforced the need for her to completely quit smoking. Tr. 261-263. The results of non-invasive peripheral vascular testing of Plaintiff's lower extremities were normal on February 19, 2008. Tr. 282-283.

Dr. Heimberger examined Plaintiff again on February 21, 2008. Plaintiff reported that her shoulder was doing better and she had less pain. It was noted Plaintiff had full active and passive range of shoulder motion, minimal crepitus, negative impingement sign, no instability, and no neurological abnormalities. Dr. Heimberger's treatment notes indicate he was pleased with Plaintiff's progress and advised her to contact him if her symptoms returned. Tr. 323. An x-ray of Plaintiff's left knee on March 18, 2008, showed some degenerative osteoarthritis. Tr. 286.

On March 19, 2008, Dr. Jim Liao, a State agency physician, reviewed Plaintiff's medical records and opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour day; sit about six hours in an eight-

5

hour day; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and occasionally reach with her right upper extremity. Dr. Liao also concluded Plaintiff should avoid concentrated exposure to extreme temperatures and environmental irritants such as fumes, odors, dusts, gases, and poor ventilation. Tr. 287-294. On June 26, 2008, Dr. Jean Smolka, another State agency physician, concurred with Dr. Liao's assessment. Tr. 296-303.

Plaintiff was hospitalized on July 3, 2008, to evaluate chest pain and complaints of right leg pain. Cardiac enzymes and an EKG did not suggest an acute myocardial infarction. Plaintiff admitted she continued to smoke cigarettes despite being counseled to quit. It was noted upon examination that Plaintiff showed normal extremities with no edema. Tr. 343-346. A cardiac catheterization was unremarkable for any obstructions and showed that she needed to better maximize her medical treatment. Tr. 355.

Plaintiff presented to Dr. Katherine Close of Smith Medical Clinic on December 9, 2008, for evaluation of pain in her shoulders, hips, arms, and right leg. Plaintiff stated that pain medications and a cortisone shot from Dr. Heimberger had not helped her pain. Dr. Close noted Plaintiff's shoulder to be frozen with no abduction, but her strength was distally good. She assessed adhesive capsulitis and prescribed non-steroidal anti-inflammatory medication. Dr. Close thought that Plaintiff's coronary artery disease seemed stable. Tr. 304. A right shoulder MRI performed on December 15, 2008, showed inflammation and edema compatible with tendinosis without tear. Tr. 309.

Plaintiff followed up with Dr. Heimberger on January 5, 2009. She stated that her symptoms returned about a month after her cortisone injection, and instead of returning to him had sought an

6

opinion/treatment from Dr. Close. Plaintiff stated her symptoms included pain over the lateral deltoid region that was worse with overhead activity, and when sleeping on the shoulder. Physical examination revealed that Plaintiff's range of motion was 0 to 90 degrees of abduction and 0 to 120 degrees of forward flexion. She denied any radicular symptoms or neck pain. Dr. Heimberger reviewed the recent MRI findings that showed no evidence of a tear. Plaintiff had a positive impingement sign, but had near full passive range of motion, only mild crepitus in the subacomial space, intact sensation, and full motor strength. He recommended Plaintiff continue conservative treatment with physical therapy and provided another cortisone injection. Tr. 324-325.

On January 8, 2009, Plaintiff reported to Dr. Rex Quigley of Smith Medical Clinic that she had not noticed any improvement in her shoulder since the injection a few days prior. Tr. 314. On January 23, 2009, Plaintiff complained of weakness and difficulty controlling her hypertension. Dr. Quigley adjusted her medications and advised Plaintiff to stop smoking. Tr. 315. A lower extremity arterial study performed on January 28, 2009, was suggestive of normal arterial flow in both of Plaintiff's lower extremities. Tr. 368.

Plaintiff attended eight physical therapy appointments in January and February 2009. She was discharged from therapy on February 4, 2009, due to lack of appreciable progress toward her physical therapy goals. Tr. 330. Plaintiff was treated at the emergency room for complaints of left shoulder pain on February 3, 2009. An x-ray of her shoulder was normal. Plaintiff received pain medication and was advised to follow up with Dr. Heimberger. Tr. 371-373.

Plaintiff was hospitalized on February 20, 2009, for evaluation of chest discomfort. Plaintiff had significant anemia secondary to dysfunctional uterine bleeding. Testing showed Plaintiff had significant uterine fibroids and bilateral ovarian cysts and she was advised to take iron supplements

7

and follow up with a gynecologist. Plaintiff was discharged on February 23, 2009. Tr. 338-344. Plaintiff followed up with Nurse Practitioner Susan Surratt of Smith Medical Clinic on February 26, 2009. Plaintiff complained of continued right shoulder pain, and she reported she did not have the resources to return to Dr. Heimberger. Examination revealed limited range of motion in her shoulders, but no other abnormalities. Pain medication was prescribed. Tr. 318. A sestamibi stress test, performed on April 15, 2009, showed no evidence of significant ischemia. Tr. 409. When Plaintiff followed up with Nurse Practitioner Surratt on July 29, 2009, it was noted she had limitation of shoulder motion due to tendinitis/bursitis and Ibuprofen was prescribed. Plaintiff was advised to schedule an appointment to follow up on her coronary artery disease. Tr. 320.

Dr. Quigley provided Plaintiff with an injection in her shoulder on October 14, 2009. Examination revealed pain with rotator cuff stress. Tr. 436. When Plaintiff returned on October 19, 2009, she complained of right leg and arm pain and weakness. Plaintiff's extremities and neurological examination were normal. Tr. 438. Plaintiff was referred for cervical x-ray and MRI, which showed no abnormalities. Tr. 416-417. On October 28, 2009, Dr. Quigley noted the MRI showed no evidence of cervical disc disease or cervical spondylosis and that Plaintiff had "remarkable relief of pain and tenderness" following the injection. He administered an injection to Plaintiff's right rotator cuff. Tr. 439.

On November 11, 2009, Dr. Quigley noted that Plaintiff complained of not experiencing improvement from the last injection. She was referred to the Medical University of South Carolina in Charleston. Tr. 444. Plaintiff went to the emergency room again on November 29, 2009, complaining of increased bilateral shoulder pain after falling. On examination, Plaintiff had only decreased range of motion, but no obvious abnormality. X-rays showed no fracture of dislocation.

8

She was assessed with an exacerbation of her chronic arthritic changes and advised to take Percocet and follow-up with her family doctor. Tr. 419-420. Plaintiff was examined at the Smith Medical Clinic on December 9, 2009 for shoulder pain. It was noted that she showed muscle tenderness over both shoulders. Tr. 445.

On January 21, 2010, Dr. Quigley completed a series of forms for Plaintiff's disability claim. Tr. 447-455. He opined that Plaintiff's pain resulted in marked restriction of activities of daily living and social functioning and deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner. Tr. 447. Dr. Quigley also stated Plaintiff had anginal pain, positive exercise tolerance test, inability to perform exercise tolerance due to cardiac risk, history of myocardial infarction, weakness and fatigue due to cardiac condition, and obesity affecting her cardiac condition. He opined that Plaintiff could stand for thirty minutes at a time and two hours in an eight-hour workday, sit four hours at a time and four hours in an eight-hour workday, lift five pounds occasionally and no weight frequently, never use her hands for fine or gross manipulation, constantly use her left arm below shoulder level, could never raise her arms over shoulder level, and needed to elevate her legs most of the time. Tr. 449-50, 455. Dr. Quigley further noted that Plaintiff had inflammatory arthritis which he thought resulted in moderate limitations in Plaintiff's activities of daily living, mild limitation in social functioning, and marked limitation in completing tasks due to deficiencies in concentration, persistence, or pace. Tr. 454.

## **HEARING TESTIMONY**

At the hearing before the ALJ, Plaintiff testified that she could not work because of shoulder pain and problems with her legs. She stated that both of her shoulders were "frozen" and that she had very limited motion in her shoulders. Tr. 33. Plaintiff indicated she could not lift her right hand

9

higher than her waist or her left hand higher than her chest. She said that Dr. Quigley recommended surgery on her rotator cuffs, but she did not have any insurance. Tr. 34. Plaintiff described pain and weakness in her legs, left knee swelling, and shortness of breath. Tr. 35. Plaintiff estimated that she could sit for forty-five minutes at a time, stand for fifteen or twenty minutes at a time, and walk for only a half a block. Tr. 36. Plaintiff reported she could lift "very little" because her hands were weak, and indicated she could not lift more than about ten pounds. Tr. 36-37. She testified that although she used a cane, it had not been prescribed for her. Tr. 38. She said that she spent three to four hours every day with her legs elevated. Tr. 40. Plaintiff stated her daughter had to help her with dressing and grooming, and did the household chores. Tr. 39-40. She also testified that she drove approximately three blocks every other day to visit her mother. Tr. 30.

## **DISCUSSION**

Plaintiff alleges that: (1) the ALJ erred in evaluating the opinion of her treating physician (Dr. Quigley); and (2) the ALJ erred in failing to explain her findings regarding Plaintiff's RFC. The Commissioner contends that the final decision that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence[1] and free of legal error.

---

[1]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

A. Treating Physician

Plaintiff argues that the ALJ erred in giving no weight to Dr. Quigley's medical statements. She argues that, contrary to the ALJ's opinion, Dr. Quigley's notes do not show relatively normal objective examinations because Dr. Quigley reported that an MRI showed tendinitis of her AC ligament, an examination revealed pain with rotator cuff stress (Tr. 436), and Dr. Quigley also noted that Plaintiff was tender over muscles in both shoulders (Tr. 445). Plaintiff also argues that Quigley had access to notes from other providers at Smith Medical Clinic that indicated Plaintiff's shoulder was frozen and would not abduct, she reported she could not hold a glass in her hand, and an examination revealed edema in her lower extremities. She also points out that Dr. Heimberger stated she had impingement syndrome with subacromonial bursitis that required cortisone injections (Tr. 255, 324-325), and he referred her to a physical therapist which did not improve her condition (Tr. 327-337). Plaintiff also notes that although 2009 x-rays of her shoulder were unremarkable, an MRI (Tr. 309) showed inflammation and edema within the musculoskeletal insertion of her rotator cuff compatible with tendinitis. Plaintiff alleges that the ALJ substituted his judgment for that of a competent medical opinion. Additionally, she argues that if there was insufficient corroborating evidence in Dr. Quigley's treating notes, the ALJ should have recontacted Dr. Quigley for an explanation. The Commissioner contends that the ALJ properly discounted Dr. Quigley's January 2010 opinions because they were inconsistent with the overall medical evidence which showed relatively normal objective examinations with few clinical findings and no mental limitations; were not consistent with the radiographic evidence which showed unremarkable findings; and were inconsistent with his own findings in his treatment notes. Additionally, the Commissioner

11

argues that the ALJ was not required to recontact Dr. Quigley because the evidence before the ALJ was not inadequate to make a determination.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ's decision to discount Dr. Quigley's opinions is supported by substantial evidence and correct under controlling law. The ALJ specifically rejected these opinions because his statements were not well supported by the medical evidence of record, were unsupported by Dr.

Quigley's Smith Clinic treatment notes showing relatively normal objective examinations with few clinical findings and no mental limitations, were contradicted by the orthopedic treatment notes of Dr Heimberger showing few findings, and were contradicted by Plaintiff's x-rays and MRI scans. Tr. 17. Although Dr. Quigley opined that Plaintiff had weakness and fatigue due to her cardiac condition (Tr. 449), the medical records indicate that Plaintiff did well with regard to her cardiac problems. See, e.g., Tr. 235 (Dr. Devlin[2] found on December 12, 2007 that Plaintiff had no limitations from a cardiac standpoint and could return to work); Tr. 304 (Dr. Close noted on December 9, 2008, that Plaintiff's coronary artery disease appeared to be stable). Dr. Quigley's statements were inconsistent with his own findings in his treatment notes. Although Dr. Quigley opined that Plaintiff could never use her hands for fine or gross manipulation (Tr. 455), there is no indication in his notes that Plaintiff reported problems to him regarding the use of her hands, and he never noted any such findings with regard to her hands. Dr. Quigley stated that Plaintiff needed to elevate her legs most of the time (Tr. 450), but his treatment notes never mentioned such a need, nor did they indicate a medical condition which would require Plaintiff to elevate her legs.

The ALJ's decision to not recontact Dr. Quigley is also supported by substantial evidence and correct under controlling law. An ALJ is only required to recontact a physician if the evidence before her is inadequate to make a determination. See 20 C.F.R. §§ 404.1512(e) and 416.912(e)(2010).[3]

---

[2]In his brief, the Commissioner at times incorrectly refers to Dr. Devlin as Dr. Jones.

[3]At the time of the ALJ's decision, this section provided, in part:
(e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a
(continued...)

"[T]hese regulations impose a duty to recontact a treating physician only when the record is inadequate to make a determination of disability." Jackson v. Barnhart, 368 F.Supp.2d 504, 507, n. 1 (D.S.C. 2005); see also Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 205 (3d Cir. 2008)(noting the regulation's "important prerequisite" that a medical source will be recontacted for clarification if the evidence available is inadequate for Agency to determine whether claimant is disabled); Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir.2004)(finding duty to recontact "only when the evidence received is inadequate" to make a disability determination); Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000)(requiring recontact when the ALJ was faced with "an incomplete medical history"); Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir.1999)(the ALJ is obligated to develop a claimant's medical history "where there are deficiencies in the record"). Here, the evidence before the ALJ was adequate to make a determination. The record includes objective tests and findings, medical treatment notes, and medical opinions sufficient to make a determination.

---

[3](...continued)
determination or a decision. To obtain the information, we will take the following actions.

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

20 C.F.R. §§ 404.1512(e) and 416.912(e). Effective March 26, 2012, the Commissioner amended 20 C.F.R. §§ 404.1512 and 416.912 to remove former paragraph (e) and the duty it imposed on ALJs to recontact a disability claimant's treating physician under certain circumstances. See How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651-01 (Feb. 23, 2012).

B.   RFC

Plaintiff alleges that the ALJ did not adequately explain her findings regarding the RFC determination as required by SSR 96-8p. She also argues that the ALJ never specifically included Plaintiff's allegations of the need to use a cane and the need to elevate her lower extremities when sitting. The Commissioner contends that ALJ's RFC determination is supported by substantial evidence. Additionally, the Commissioner argues that the ALJ did not err in not including in the RFC Plaintiff's alleged need for a cane and her alleged need to elevate her legs because the ALJ was not required to accept Plaintiff's subjective complaints which were not supported by the record.

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis...." SSR 96-8p. The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. Id.

The ALJ's determination that Plaintiff had the RFC to perform a reduced range of sedentary work despite her impairments is supported by substantial evidence and correct under controlling law. Here, the ALJ properly considered the medical and nonmedical evidence in determining Plaintiff's RFC. Although Plaintiff alleged in her December 10, 2007 application for benefits that she could not work because of her cardiac condition (Tr. 142), she did well after her heart attack with few cardiac symptoms and essentially normal examinations. See, e.g., Tr. 235 (December 2007 treatment notes indicate Plaintiff reported no chest pain or shortness of breath and examination was essentially

15

normal); Tr. 261-262 (February 2008 treatment notes indicate that Plaintiff reported only "some chest pain on occasion" and examination was normal); Tr. 355 (cardiac testing during July 2008 hospitalization unremarkable for any obstructions and indicated only that Plaintiff should maximize her medical treatment); Tr. 304 (Dr. Close opined that Plaintiff's coronary artery disease was stable in December 2008). On December 12, 2007, Plaintiff's treating cardiologist, Dr. Devlin, advised Plaintiff that she had no limitations from a cardiac standpoint and could return to work. Tr. 235. Dr. Devlin's conclusion provided support for the ALJ's decision that Plaintiff's cardiac condition did not result in any greater limitations than in her RFC assessment. See, e.g., Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)(record supported denial of benefits where the physicians who examined Plaintiff and heard his complaints of pain failed to give an opinion that he was totally and permanently disabled).

The ALJ's decision to limit Plaintiff to a reduced range of sedentary work, which included that she could only occasionally reach with her right upper extremity to table level and with her left upper extremity to chest level and could not climb ropes, ladders, or scaffolds or crawl (Tr. 14, 16-17) based on her shoulder and knee impairments is also supported by substantial evidence. On January 10, 2008, Plaintiff first complained of right shoulder pain, in particular with overhead activity and when sleeping on her shoulder. Tr. 254. Dr. Heimberger provided her with a cortisone injection on that date, and by February 21, 2008, Plaintiff reported that her shoulder was better and she had less pain. Examination showed full active and passive range of shoulder motion, minimal crepitus, negative impingement sign, no instability, and no neurological abnormalities. Tr. 323. Dr. Heimberger advised Plaintiff to follow up with him if her symptoms returned, but she did not seek any further treatment for her shoulder for almost ten months (see Tr. 324). See Mickles v. Shalala,

29 F.3d 918, 930 (4th Cir. 1994)(ALJ did not err by considering the inconsistency between claimant's level of treatment and her claims of disabling pain). Plaintiff did not mention any shoulder pain and the issue was not listed in her past medical history during her July 2008 hospitalization for chest pain. Tr. 345. She reported that her shoulder was better and she had less pain after Dr. Heimberger provided her with a cortisone injection (on January 10, 2008). Contrary to this statement, Plaintiff told Dr. Close in December 2008 that the shot did not work. Tr. 304.

On January 5, 2009, Plaintiff returned to Dr. Heimberger and complained of shoulder problems with overhead activity and sleeping on her shoulder, but denied having any radicular symptoms or neck pain. Although she had positive impingement sign, she had near full passive range of motion, only mild crepitus, intact sensation, and full motor strength. Tr. 324. Dr. Heimberger recommended continued conservative care including physical therapy and another injection. Tr. 324-325. Such conservative treatment is not indicative of a disabling hand limitation during the relevant period. Gross v. Heckler, 785 F.2d 1163, 1165-6 (4th Cir. 1986)( "If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). Plaintiff continued to complain of problems with her right shoulder after that time, but examinations consistently revealed few abnormalities other than limitation of shoulder motion. Tr. 318, 320, 419, 436, 445. The ALJ's decision is also supported by the opinions of the state agency physicians who found that Plaintiff could perform a range of light work. See 20 C.F.R. §§ 404.1527 and 416.927; SSR 96-6p ("Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review.").

Objective medical evidence also supported the ALJ's decision. Right shoulder x-rays showed no acute findings. Tr. 255. Although a right shoulder MRI in December 2008 showed inflammation and edema compatible with tendinosis, it revealed no tear. Tr. 309. A left shoulder x-ray in February 2009 was normal. Tr. 373. An MRI in October 2009 revealed no evidence of cervical disc disease or cervical spondylosis. See Tr. 439. X-rays of Plaintiff's right and left shoulders in November 2009 showed no abnormalities. Tr. 428. In March 2008, x-rays merely revealed some degenerative osteoarthritis of Plaintiff's left knee, with no acute abnormalities. Tr. 286. Despite her impairments, Plaintiff was noted to retain normal motor strength. See Tr. 235, 262.

The ALJ's decision to not include Plaintiff's alleged need for a cane and her need to elevate her legs is also supported by substantial evidence. The ALJ specifically noted Plaintiff's testimony concerning her alleged need to use a cane and elevate her legs, but found that Plaintiff was only partially credible and that her subjective allegations were not credible to the extent they were inconsistent with the RFC found by the ALJ. See Tr. 14-15, 17. Although Plaintiff testified that she used a cane, she admitted that no physician prescribed the use of a cane. Tr. 38; see Tr. 13. Dr. Devlin noted that Plaintiff switched the cane from side to side and used it inconsistently. Tr. 234; see Tr. 13. Although Dr. Quigley opined in January 2010 that Plaintiff needed to elevate her legs most of the time (Tr. 45), the ALJ properly rejected that opinion (as discussed above). The treatment notes of Dr. Quigley as well as those of Plaintiff's other treating and examining physicians do not mention such a need, nor do they show a medical condition which would require such elevation of her legs. Although Nurse Practitioner Surratt noted on one occasion (July 2009) that Plaintiff had edema (Tr. 320), the other treatment notes of record do not indicate edema. In February 2008, Dr.

Devlin noted no edema of Plaintiff's extremities (Tr. 262), and no peripheral edema was noted during her July 2008 hospitalization (Tr. 346).

## **CONCLUSION**

Based on the foregoing, it is recommended that the Commissioner's decision be **affirmed**.

Joseph R. McCrorey
United States Magistrate Judge

September 28, 2012
Columbia, South Carolina